UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CURT LOWDER,

                  Petitioner,

v.                                             CAUSE NO. 3:20-CV-868-DRL-MGG

WARDEN,

                  Respondent.

OPINION AND ORDER

Curt Lowder, a prisoner without a lawyer, filed a habeas corpus petition to challenge his convictions for murder and battery under Case No. 49G04-1012-MR-92401. Following a jury trial, on December 6, 2011, the Marion Superior Court sentenced him as a habitual offender to ninety years of incarceration.

BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence from the trial:

> In the early morning hours of December 13, 2010, Lowder and his girlfriend, Angela Dodson, returned to their shared residence after consuming alcohol at a local bar. Lowder and Dodson were joined by their mutual friend Troy Malone and a fourth individual who departed before the incident in question occurred. At approximately 3:00 a.m., Lowder placed a telephone call to his friend David Applegate in search of beer. Lowder then drove in his truck to the Applegate residence, accompanied by Dodson and Malone.
>
> At the Applegate residence, Dodson and Malone waited in the truck while Lowder went inside and spoke with Applegate and Applegate's thirteen-year-old son, D.A. During this conversation, Lowder received a call on his

cellular telephone, became angry, and left the Applegate residence without taking any beer. Lowder testified that Dodson had accidentally called Lowder from the truck on her cellular telephone and that, upon answering this call, Lowder overheard Dodson performing oral sex on Malone.

Outside the Applegate residence, Lowder approached the passenger side of his truck, where Malone was seated, and asked, "What the f* * * you watching out for?" Malone replied, "What the f* * * are you talking about?", and Lowder claimed, "You're out here f* * *ing around with my old lady." Lowder then drew a handgun from his waistband and struck Malone in the face with it. Malone exited the truck, raised his hands, and backed away before walking off down the street.

At some point during the incident between Lowder and Malone, Lowder's handgun discharged. The bullet struck Dodson in the head, entering through her right eye. At trial, Lowder testified that the gun accidentally fired when he used it to strike Malone in the face. D.A. heard the gunshot from inside the Applegate residence and opened the front door to see Lowder standing at the driver side door of his truck and holding a handgun. Malone was seen standing at the rear of the truck with Dodson inside the bloody truck, slumped down, and not moving. As Malone began to back away from the truck, D.A. heard Lowder ask, "What the f* * * do I do now, she's dead?" Lowder then got into his truck and drove away.

Lowder drove to the parking lot of a McDonald's restaurant with Dodson, severely wounded and bleeding, still inside the truck. Lowder testified that he stopped at the restaurant in order to calm his nerves and to compose himself. He then drove Dodson to the emergency room at St. Francis Hospital. Dodson was pronounced dead from a gunshot wound to the head at approximately 5:00 a.m.

At the hospital, Lowder told a security guard that Dodson had been shot at a Marathon gas station. Lowder also placed a telephone call to Dodson's father and gave him the same explanation. Lowder similarly told the responding Indianapolis Metropolitan Police Department ("IMPD") officer, Erin Righam, that Dodson had been shot at a gas station. Officer Ringham testified that Lowder "acted more nervous than upset." And another police officer testified that Lowder "seemed calm" and "didn't appear to be ... overly distraught given the situation."

Lowder was taken to the IMPD homicide office to be interviewed as a witness. During his interview with Detective Kevin Duley, Lowder changed his narrative of the shooting three or four times. First, Lowder

maintained that Dodson had been shot at a Marathon gas station by an unknown assailant for an unknown reason. Lowder also initially claimed that he had not been at the Applegate residence that morning and that he drove Dodson directly to the hospital after she was shot. Lowder then claimed that Dodson was murdered at the gas station because she "owed some [drug] money to some Mexicans." Next, Lowder claimed that he had been at the Applegate residence and believed Dodson and Malone were "messing around" in his truck while he was inside. When Lowder confronted Dodson and Malone, the handgun Lowder was brandishing accidentally discharged. At trial, Lowder admitted that he lied to police on multiple occasions and fabricated different accounts of the shooting. Lowder also testified that upon opening the door of the truck, he saw that Malone's pants were unzipped. However, Malone contends that he and Dodson did not "fool around" while Lowder was inside the Applegate residence.

On December 16, 2010, the State charged Lowder with murder and Class C felony battery. The State later added a charge that Lowder was a habitual offender. After a trial on the charges of murder and battery, a jury convicted Lowder of both crimes.

ECF 8-5 at 2-4; *Lowder v. State*, 977 N.E.2d 474 (Ind. App. 2012).

In the petition, Mr. Lowder argues that he is entitled to habeas relief because the trial record contained insufficient evidence to support the finding that he intended to kill Angela Dodson. Mr. Lowder further argues that he received ineffective assistance of trial counsel, alleging that trial counsel failed to investigate Troy Malone, failed to investigate and impeach Virginia Applegate and David Applegate, Jr, failed to investigate Glema Cash and Theodore Lowder, failed to challenge the voluntariness of Mr. Lowder's police interview by filing a motion to suppress and by retaining a toxicology expert,[1] failed to

---

[1] In the petition, Mr. Lowder asserts that trial counsel should have retained a toxicology expert; but, in the traverse, he asserts that trial counsel should have retained an expert on the unreliability of eyewitness testimony. ECF 1 at 20-22; ECF 14-1 at 21. The court declines to consider the claim as formulated in the traverse because it is procedurally defaulted as Mr. Lowder did not present this claim to the state courts at any level. *See Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004).

explain a misleading statement that occurred during Mr. Lowder's police interview, failed to present the complete versions of recordings on Mr. Lowder's telephone conversations at the Marion County Jail, and failed to prepare an adequate trial strategy, including failing to assert self-defense and failing to dispute the charges of battery and reckless murder.

Mr. Lowder further asserts that he is entitled to habeas relief because the Marion Superior Court did not afford him additional time to gather evidence. Because there is no constitutional right to post-conviction proceedings, this claim does not present a cognizable ground for habeas relief. *See Flores-Ramirez v. Foster*, 811 F.3d 861, 866 (7th Cir. 2016) ("It is well established that the Constitution does not guarantee any postconviction process, much less specific rights during a postconviction hearing.").

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings."

*Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On direct review, Mr. Lowder presented his claim regarding insufficient evidence to the Indiana Court of Appeals and the Indiana Supreme Court. ECF 8-3; ECF 8-6. On post-conviction review, Mr. Lowder presented each of his ineffective assistance of trial counsel claims to the Indiana Court of Appeals. ECF 8-8. However, the parties dispute whether Mr. Lowder fairly presented the ineffective assistance of trial counsel claims to the Indiana Supreme Court in his petition to transfer.

To the Warden's point, the petition to transfer is vague about the scope of the appeal and does not list the claims intended as the subject of the discretionary appeal, and it does not engage with the reasoning of the Indiana Court of Appeals on any individual claim. ECF 8-11. The petition to transfer includes some language suggesting that Mr. Lowder intended for the Indiana Supreme Court to consider only the claims pertaining to trial counsel's failure to investigate and crossexamine trial witnesses, but it also includes language broad enough to suggest that Mr. Lowder intended to challenge the Indiana Court of Appeals' determination on all of his claims. *Id.* Further, the Indiana Supreme Court provided only a summary order denying transfer without explanation as to whether it found that the claims were procedurally defaulted or whether it determined that the merits of the claims did not warrant further examination. ECF 8-7 at 12. Given

this uncertainty, the court will assume without deciding that the ineffective assistance of

trial claims were fairly presented to the state courts and consider them on their merits.[2]

STANDARD

"Federal habeas review . . . exists as a guard against extreme malfunctions in the

state criminal justice systems, not a substitute for ordinary error correction through

appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants

are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To

---

[2] Notably, federal courts have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

DISCUSSION

A.     *Sufficiency of the Evidence*.

Mr. Lowder argues that he is entitled to habeas relief because the trial record contained insufficient evidence to demonstrate that he intended to kill the victim.[3] For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

---

[3] In the petition, Mr. Lowder combines this claim with a claim that the prosecution knowingly presented false testimony from Troy Malone and David Applegate, Jr., but Mr. Lowder did not raise a prosecutorial misconduct claim in tandem with his sufficiency of the evidence claim on direct appeal, and a prosecutorial misconduct claim requires a materially different analysis than a sufficiency of the evidence claim. *See Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001). The court will address the sufficiency of the evidence claim as it was presented on direct appeal and will address the allegations related to prosecutorial misconduct in the discussion of the ineffective assistance of counsel claims as Mr. Lowder first raised the allegations of prosecutorial misconduct in that context on post-conviction review.

At trial, Mr. Lowder faced charges of committing the crimes of murder, voluntary manslaughter, and reckless murder with respect to Angela Dodson and committing the crime of battery with respect to Troy Malone. ECF 9-2 at 138-39. The prosecution presented David Klooster who worked as a security guard for a hospital. ECF 9-3 at 28-35. He testified that he worked at the hospital on the night that Mr. Lowder shot Angela Dodson. *Id.* He spoke with Mr. Lowder when he brought her to the hospital, and Mr. Lowder attributed her gunshot wound to an unidentified individual at a gas station. *Id.* Erin Ringham, a police officer, testified that she responded to the emergency call at the hospital. *Id.* at 38-43. When she spoke with Mr. Lowder, he repeated that an unidentified individual shot Angela Dodson at a gas station. *Id.* Angela Dodson's father testified that Mr. Lowder provided a similar explanation to him during a telephone call on the night of the incident. *Id.* at 47-50.

Troy Malone testified that he saw Mr. Lowder and Angela Dodson on the night of incident. *Id.* at 54-66. According to his testimony, the three were on their way home in Mr. Lowder's vehicle after a night at the bars and stopped at the Applegate residence for more alcohol. *Id.* He testified that he did not "fool around" with Angela Dodson and that he did not know whether she called Mr. Lowder while he was in the Applegate residence. *Id.* When Mr. Lowder came back from the house to his vehicle, Mr. Lowder approached Mr. Malone angrily and accused him of "fucking around" with Angela Dodson. *Id.* He denied it, and Mr. Lowder struck him in the head with a pistol. *Id.* Mr. Malone exited the vehicle and walked to his mother's house. *Id.* On his way, Virginia Applegate and her son, David Applegate, Jr., found him in their vehicle, and he told them what happened

8

at their request. *Id.* During his testimony, Mr. Malone denied hearing a gunshot or seeing anyone shoot Angela Dodson. *Id.* He also denied "a powder burn" on his forehead or any difficulties hearing after Mr. Lowder had struck him with the pistol. *Id.*

David Applegate, Jr., testified that he was present when Mr. Lowder arrived at his house. *Id.* at 83-99. He observed Mr. Lowder become angry after "messing" with his cellphone and left the house without the alcohol that had been set aside for him. *Id.* He followed Mr. Lowder and heard a gunshot before reaching the front door. *Id.* He saw Mr. Lowder standing by his vehicle with Angela Dodson slumped inside. *Id.* Mr. Lowder said to Troy, "What the fuck do I do now? She's dead." *Id.* He saw Mr. Malone walk away from the vehicle bleeding from the head, and he also saw Mr. Lowder drive away slowly. *Id.* He told his mother that Mr. Lowder had shot Angela Dodson, and they found Mr. Malone and asked him what happened. *Id.* Virginia Applegate testified, confirming her son's testimony. *Id.* at 110-17.

Dr. Joyce Carter, chief forensic pathologist for the Marion County Coroner's Office, testified about powder burns as follows:

> **Prosecution:** Doctor, I'm going to ask you about powder burns now. What are powder burns?
>
> **Dr. Carter:** Powder burns come from the heat from the gun, from the muzzle. And when the gun is fired and you actually are able to videotape that, you'll see a little flame there and sometimes the wound. It just can be heated because the energy of the bullet coming through the muzzle.
>
> **Prosecution:** So if the muzzle were close to or nearly contacting human skin at the time that it went off, would it leave burn marks on the skins?
>
> **Dr. Carter:** Yes. We actually will have some very dark discoloration surrounding that wound and that is from the heat.

*Id.* at 227-28.

Bryce Russell Wolf, a correctional officer, testified about the recording system for telephone calls by inmates at the Marion County Jail. *Id.* at 238-41. Detective Kevin Duley testified about his interview of Mr. Lowder, which occurred the morning after the shooting. *Id.* at 245-51; ECF 9-4 at 2-71. He also interviewed Mr. Malone later that day. *Id.* He observed that Mr. Malone had left eye injuries but no difficulties hearing or facial powder burns. *Id.* Through Detective Duley, the prosecution introduced recordings of Mr. Lowder's telephone conversations at the Marion County Jail and of his interview. *Id.* At the outset of the interview, Mr. Lowder told Detective Duley that a stranger shot Angela Dodson at a Marathon gas station but denied stopping at the Applegate residence that night. ECF 9-8. Detective Duley told Mr. Lowder that he had contradictory statements from the Applegates and had reviewed the surveillance recording from the gas station. *Id.* Mr. Lowder responded that he had stopped on the road near the Applegate residence to collect himself and had met with Mexican drug dealers to whom Angela Dodson owed money and that they had shot her. *Id.* Mr. Lowder then told Detective Duley that he had approached his vehicle under the belief that Mr. Malone and Angela Dodson were "messing around" but that he was not angry. *Id. Mr.* Malone had a pistol, and when Mr. Lowder tried to grab it from Mr. Malone, the pistol fired. *Id.* Mr. Lowder told Detective Duley that he was not allowed to possess firearms due to his criminal history and denied ever having the pistol in his possession. *Id.*

In the telephone conversations, Mr. Lowder described his recollection of the incident as follows:

- From December 18, 2010, to December 22, 2010, he said he was under the influence of Xanax and could not remember anything about the killing except seeing a man at a gas station.

- On January 6, 2011, he said he was willing to admit guilt but did not kill Angela Dodson intentionally.

- On January 12, 2011, he said he wanted to tell people what had happened but wanted to avoid contradicting himself until after his trial.

- On February 11, 2011, he said he went out to his vehicle to see what was going on and "flipped out" "like a sudden heat" and did not plan to hurt anyone.

- On February 18, 2011, he said the killing was accidental and occurred when he struck Malone in face with the pistol and it went off.

ECF 9-7 at 40-68.

Mr. Lowder testified that he received a call from Angela Dodson while inside the Applegate residence, and he left the house to investigate. ECF 9-4 at 80-103. He saw Mr. Malone's unzipped pants, pulled out his pistol, struck Mr. Malone's face with it, and the pistol fired. *Id.* Mr. Malone exited the vehicle and walked down the street. *Id.* He drove Angela Dodson to the hospital after a brief stop at a McDonald's to collect himself. *Id.* On cross-examination, he conceded that he had repeatedly lied to the police and to friends and family members to avoid responsibility for his actions. *Id.* at 104-21.

On direct appeal, the Indiana Court of Appeals rejected the claim that the evidence supported only voluntary manslaughter or reckless homicide. ECF 8-5 at 5-7. The appellate count recounted Mr. Lowder's shifting narratives and reasoned that, while only

circumstantial evidence suggested that Mr. Lowder committed murder rather than voluntary manslaughter or reckless homicide, the jury was entitled to credit that evidence over Mr. Lowder's testimony to the contrary. *Id.*

After reviewing the record, the court cannot determine that the state court made an unreasonable determination on the sufficiency of the evidence claim. As an initial matter, the record established that Mr. Lowder shot Angela Dodson in the eye, and this information tends to prove that Mr. Lowder intended to kill her. *See Perez v. State*, 872 N.E.2d 208, 213–14 (Ind. App. 2007) ("Discharging a weapon in the direction of a victim is substantial evidence from which the jury could infer intent to kill."); *Corbin v. State*, 840 N.E.2d 424, 429 (Ind. App. 2006) ("Intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily injury, in addition to the nature of the attack and circumstances surrounding the crime.").

The record also contained evidence that may have persuaded a reasonable jury to disregard Mr. Lowder's narratives, including Mr. Malone's testimony in which he denied engaging in any sexual activity with Angela Dodson or observing the firing of the pistol. Mr. Malone and Detective Duley further testified to the absence of impaired hearing or a facial powder burn on Mr. Malone—symptoms that would have likely been present if the pistol had discharged as Mr. Malone was struck on the face. Additionally, the evidence included a pattern of shifting narratives from Mr. Lowder and established consciousness of guilt and his willingness to lie in an effort to avoid consequences. By contrast, Mr. Malone's narrative remained consistent from his report to the Applegates in the immediate aftermath of the shooting until trial.

On this record, a jury could reasonably have found that Mr. Malone and Angela Dodson were not engaging in sexual activity by crediting the testimony of Mr. Malone over the testimony of Mr. Lowder. This would have caused the jury to reject the charge of voluntary manslaughter as the alleged sexual activity constituted the only arguable basis for the sudden heat element of the charge in the record.[4] Similarly, a jury may have reasonably found that the pistol did not discharge as Mr. Lowder struck Mr. Malone in the face with the pistol as it discharged by crediting the testimony of Mr. Malone and Detective Duley, and this alleged accidental firing is the sole factual basis in the record for the charge of reckless homicide. A jury could reasonably be left with only the charge of murder to consider along with the manner of Angela Dodson's death, Mr. Lowder's possession of the pistol as it discharged, and his repeated fabrications, and the jury could then reasonably decide to convict on that basis. Based on the foregoing, the argument that the trial record lacked sufficient evidence to support the murder verdict is not a basis for habeas relief.

B.   *Ineffective Assistance of Trial Counsel – Troy Malone.*

Mr. Lowder argues that he is entitled to habeas relief because trial counsel provided ineffective assistance by failing to investigate Troy Malone. He maintains that, if trial counsel had investigated, she would have discovered that Mr. Malone had lied

---

[4] The court observes that neither party argued for a voluntary manslaughter conviction at closing, though counsel's arguments are immaterial to a sufficiency of the evidence analysis. Instead, the prosecution sought a murder conviction, whereas trial counsel asked the jury to find Mr. Lowder guilty of battery and reckless homicide consistent with Mr. Lowder's testimony rather than the more serious offenses of murder and voluntary manslaughter. ECF 9-4 at 142-72.

about not engaging in sexual activity with Angela Dodson and not hearing or seeing the
gunshot fired at Angela Dodson.

To prevail on an ineffective assistance of counsel claim, a petitioner must show
that counsel's performance was deficient and that the deficient performance prejudiced
him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that
counsel's conduct falls within the wide range of reasonable professional assistance; that
is, the defendant must overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic
choices made after thorough investigation of law and facts relevant to plausible options
are virtually unchallengeable; and strategic choices made after less than complete
investigation are reasonable precisely to the extent that reasonable professional
judgments support the limitations on investigation." *Id.* at 690–91. The test for prejudice
is whether there was a reasonable probability that "but for counsel's unprofessional
errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable
probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at
693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be
substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). "On habeas
review, [the] inquiry is now whether the state court unreasonably applied *Strickland*."
*McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even
'egregious' failures of counsel do not always warrant relief." *Id.*

At the post-conviction stage, Mr. Lowder presented an affidavit from Mr. Malone
in which he attested that he made unwanted advances on Angela Dodson in the vehicle

14

and that she called Mr. Lowder for help. ECF 9-16 at 53-56. He attested that he tried to hit Mr. Lowder when he approached the vehicle. *Id.* He attested that Mr. Lowder acted to defend himself by striking Mr. Malone in the face with the butt of a pistol, which discharged a bullet behind Mr. Malone and toward Angela Dodson. *Id.* According to Mr. Malone, the police told him that they knew he was lying in an interview on December 14, 2010, at 5:30 p.m.[5] *Id.* Mr. Malone further attested that, if trial counsel had contacted him, he would have told her about this sequence of events. *Id.*

At a hearing, trial counsel testified that she spoke with Mr. Malone by telephone. ECF 9-14 at 6-51. She did not depose witnesses because she had the police statements and because conducting a deposition would have allowed the prosecution to use the deposition transcript at trial if Mr. Malone failed to appear. *Id.* She suspected that Mr. Malone would fail to appear due to his criminal background and because she found him unreliable. *Id.* Mr. Malone testified that he never spoke with trial counsel and that he had lied to avoid disappointing his spouse and to avoid parole revocation. *Id.* at 51-65. On crossexamination, Mr. Malone conceded that he was unsure about whether he would have conveyed the narrative from his affidavit to trial counsel or at trial if trial counsel had contacted him. *Id.*

The Marion Superior Court rejected this claim, crediting trial counsel's testimony regarding the scope of her investigation, including her telephone conversation with Mr.

---

[5] According to the transcript of this interview, law enforcement expressed doubt on certain issues due to conflicting evidence but did not assert that they knew he was lying during the interview. ECF 9-17 at 29-47.

Malone. ECF 9-12 at 158-83. On appeal, the Indiana Court of Appeals affirmed, finding that trial counsel reasonably investigated Mr. Malone given that she spoke with Mr. Malone, reviewed his police statements, and had strategic reasons for declining to depose him. ECF 8-10 at 8-12. The appellate court further found that Mr. Lowder had not established that Mr. Malone would have testified consistent with his affidavit given the uncertainty expressed by Mr. Malone on post-conviction review about how he would have testified at trial. *Id.*

The court cannot find that the state court made an unreasonable determination on this claim. To start, 28 U.S.C. § 2254(e)(1) requires this court to defer to the state court's fact determinations unless rebutted with clear and convincing evidence. The findings that trial counsel reviewed Mr. Malone's police statements, spoke with him by telephone, and declined to depose him for strategic reasons adequately support the conclusion that trial counsel did not fail to adequately investigate Mr. Malone. Nor did the state court err by finding a lack of prejudice given Mr. Malone's equivocal commitment as to how he would have testified at trial if trial counsel had called him as a witness. Therefore, this claim is not a basis for habeas relief.

C.    *Ineffective Assistance of Trial Counsel – Applegates.*

Mr. Lowder argues that he is entitled to habeas relief because trial counsel provided ineffective assistance by failing to investigate David Applegate, Jr. and Virginia Applegate. According to Mr. Lowder, if trial counsel had investigated, she would have discovered that these witnesses had lied about their observations on the night of the incident.

In the petition and traverse, Mr. Lowder does not identify any particular portion of Virginia Applegate's testimony that should have been impeached, nor does he explain how trial counsel should have impeached such testimony. With respect to David Applegate, Jr., Mr. Lowder's focus is on the testimony that Mr. Applegate followed Mr. Lowder, heard a gunshot before reaching the front door, and saw Mr. Lowder standing by his vehicle near the driver-side door.

According to Mr. Lowder, trial counsel should have impeached this testimony from Detective Schemenaur's notes and the transcript of his police interview. He also asserts that trial counsel should have objected to this testimony on the basis that the prosecution knew that it constituted perjury. The detective's notes read as follows:

> Checked on noise, heard boom, [Mr. Lowder] by passenger door, man walking backwards, saw [Mr. Lowder] w/gun, "What do I do now, she's dead!" got in truck and left.

ECF 9-16 at 42-46. The transcript of the police interview read as follows:

> **Q:** Okay. David, it has come to my attention that you may have seen or heard some of the events that had transpired leading up to this investigation we're currently working. Tell me in your own words what you saw, what you heard, and anything that you feel would be important for me to know.
>
> **A:** I was playing my Wii, and I went to check out this noise that my dad told me to come check out. After he walked out . . . 'cause he walked in . . . you know the story, I already told you.
>
> **Q:** Okay.
>
> **A:** And he said, "Hold on, I'll be right back," and we heard this . . . the minute I went around to check and I see [Mr. Lowder] out by his passenger door and then I seen a guy walking down the street backwards holding his hands out. And then I seen [Mr. Lowder] turn and walk from the back

corner of the truck and I seen he had a gun, and I didn't know what kind of gun though. He said, "What do I do now, she's dead."

*Id.* at 34-40.

At the post-conviction stage, trial counsel testified that she did not recall reviewing the detective's notes or the transcript but that she would have if she had them. ECF 9-14 at 6-51. She did not recall what questions she asked David Applegate, Jr., or whether she impeached him. *Id.* She agreed that efforts to impeach witnesses on minor details risked her credibility with the jury. *Id.* On appeal, the Indiana Court of Appeals found no evidence that the prosecution knowingly introduced perjured testimony. ECF 8-10 at 8-12, 17-20. The appellate court further found that trial counsel strategically declined to impeach the Applegates with minor details and that Mr. Lowder had made no showing with respect to prejudice, noting that the defense conceded that Mr. Lowder killed Angela Dodson and that David Applegate, Jr., did not see the shooting and could not testify as to Mr. Lowder's mental state during the shooting. *Id.*

After reviewing the record, the court cannot find that the state court made an unreasonable determination on these claims. The sole factual discrepancy between Mr. Applegate's testimony at trial and his prior statements was whether he observed Mr. Lowder standing by the driver-side door or the passenger-side door. Though this testimony may have been false and the prosecution may have been aware that his testimony was inconsistent with his prior statements, the record contains no evidence to suggest that the testimony was an intentional misstatement rather than an inadvertent

one or that the prosecution knew that the testimony was a misstatement rather than a purposeful correction of his prior statements.

In the habeas petition, Mr. Lowder argues that the testimony regarding his presence at the driver-side door allowed the jury to believe that Mr. Lowder walked around the vehicle to the driver-side after striking Troy Malone and then shot Angela Dodson. To Mr. Lowder's point, the prosecution relied on Mr. Applegate's testimony in arguing for the jury to believe that sequence of events at closing. ECF 9-4 at 170-71. This closing argument may have had some persuasive force as it contradicted Mr. Lowder's testimony and provided a narrative for the jury to find that Mr. Lowder intended to kill Angela Dodson that had not been previously offered. The Indiana Court of Appeals seems not to have addressed this argument pertaining to prejudice, but this was likely because Mr. Lowder never included it in his brief. ECF 8-8. Notably, under Indiana law, litigants are required to prepare appellate briefs so that the issues can be considered without reference to a transcript, and "it is not [the appellate court's] responsibility to develop arguments for either party." *Horton v. State*, 51 N.E.3d 1154, 1162 (Ind. 2016); *Pluard ex rel. Pluard v. Patients Compen. Fund*, 705 N.E.2d 1035, 1038 (Ind. Ct. App. 1999). Because Mr. Lowder omitted this prejudice argument and presented no other to the Indiana Court of Appeals, the state court did not unreasonably determine that Mr. Lowder did not satisfy his burden with respect to prejudice. Moreover, though it is unclear why Mr. Lowder believes that trial counsel had grounds to impeach Virginia Applegate, her testimony in its entirety was substantially immaterial to the outcome of

case, consisting solely of receiving information from her son and a brief conversation with Mr. Malone. Therefore, this claim is not a basis for habeas relief.

      D.     *Ineffective Assistance of Trial Counsel – Sentencing.*

Mr. Lowder argues that he is entitled to habeas relief because trial counsel failed to call his siblings, Glema Cash and Theodore Lowder, as witnesses at his sentencing hearing. He maintains that they would have testified about their abusive father as well as Mr. Lowder's legal issues and drug use during his childhood.

At sentencing, trial counsel presented Glema Cash, who testified that the criminal proceedings were hard on Mr. Lowder's family and that she considered Angela Dodson's family as her family too. ECF 9-4 at 245-46. When trial counsel asked her if she had any other information for the court's consideration, she said, "Everyone involved is lose here and especially the Dodsons. There is no winners here." *Id.*

At the post-conviction stage, Mr. Lowder submitted affidavits from Glema Cash and Theodore Lowder that, if they had been questioned at sentencing, they would have testified about their abusive father as well as Mr. Lowder's legal issues and drug use during his childhood. ECF 9-16 at 51-52. Trial counsel testified that she could not recall whether she investigated Mr. Lowder's childhood. ECF 9-14 at 6-51. Glema Cash and Theodore Lowder testified that they did not tell trial counsel about Mr. Lowder's childhood. *Id.* at 66-72. Mr. Lowder testified that he told trial counsel "some certain things" about his childhood and that he could not recall what he said during the presentence investigation. *Id.* at 73-85.

The Marion Superior Court found that the trial court had considered Mr. Lowder's childhood and drug use, which were noted in the presentence investigation report.[6] ECF 9-12 at 158-83. It found that Mr. Lowder declined to reveal information about his childhood during the presentence investigation and that his siblings may have been similarly reluctant to discuss it. *Id.* It further found that trial counsel called Glema Cash to testify at the sentencing hearing where she declined to discuss their childhood despite trial counsel's prompting for additional information. *Id.* On appeal, the Indiana Court of Appeals observed that neither sibling had testified regarding Mr. Lowder's childhood at the post-conviction hearing or had informed trial counsel regarding his childhood. ECF 8-10 at 28-29. The appellate court concluded that Mr. Lowder could not prevail on this claim because he didn't demonstrate counsel's awareness of his childhood history. *Id.*

The court cannot find that the state courts made an unreasonable determination on this claim. Arguably, trial counsel should have inquired about Mr. Lowder's childhood on her own; but, given that Mr. Lowder and his siblings did not volunteer such information at sentencing or otherwise, she had no reason to suspect that they had material information about Mr. Lowder's childhood beyond the information included in the presentence investigation report. Further, the trial court had the presentence investigation report, which detailed Mr. Lowder's drug use and contained some information regarding Mr. Lowder's childhood. Additionally, nothing shows any amount of evidence on this point would have likely affected his sentence. Indiana courts

---

[6] The parties did not submit a copy of the presentence investigation report for the court's review.

have repeatedly observed that, under Indiana law, "evidence of a difficult childhood warrants little, if any, mitigating weight." *See, e.g., Ritchie v. State*, 875 N.E.2d 706, 725 (Ind. 2007); *Coleman v. State*, 741 N.E.2d 697, 700 (Ind. 2000); *Hudson v. State*, 135 N.E.3d 973, 979 (Ind. Ct. App. 2019); *Patterson v. State*, 909 N.E.2d 1058, 1062 (Ind. Ct. App. 2009). Therefore, this claim is not a basis for habeas relief.

      E.      *Ineffective Assistance – Voluntariness of the Police Interview.*

Mr. Lowder argues that he is entitled to habeas relief because trial counsel failed to challenge the voluntariness of his police interview. He maintains that he was so intoxicated on Xanax and alcohol that he did not understand what he was saying during the police interview and that trial counsel should have presented expert testimony on the effects of intoxication.

The due process analysis for the voluntariness of confessions is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). "The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* "A confession is voluntary if, considering the totality of the circumstances, it is the product of a rational intellect and free will, and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Pole v. Randolph*, 570 F.3d 922, 941 (7th Cir. 2009). "Courts may consider, among other things, the age, experience, education, background and intelligence of the accused, the length of the questioning, and other circumstances surrounding the interrogation when evaluating

whether a confession was voluntarily given." *Id.* Under Indiana law, "it is only when an accused is so intoxicated that he is unconscious as to what he is saying that his confession will be inadmissible." *Carter v. State,* 730 N.E.2d 155, 157 (Ind. 2000).

At the post-conviction stage, trial counsel testified that she reviewed the video recording and the transcript of the police interview. ECF 9-14 at 6-51. She testified that she knew that Detective Duley had woken up Mr. Lowder to initiate the interview and that Mr. Lowder had taken Xanax but that she did not believe that she had a valid basis for challenging the voluntariness of the police interview. *Id.*

On appeal, the Indiana Court of Appeals rejected this claim, reasoning that, during the interview, Mr. Lowder was able to convey personal information accurately, signed and orally acknowledged a *Miranda* rights form, and orally confirmed his understanding of Detective Duley's questions and the absence of coercion with respect to the interview. ECF 8-10 at 13-17. The appellate court further observed Mr. Lowder's cogent adjustments to his false narratives when challenged by Detective Duley and found that a motion to suppress the police interview would not have been successful. *Id.* The appellate court also noted that Mr. Lowder had presented no evidence on how a toxicology expert would have testified or how it would have aided his defense. *Id.*

After reviewing the record, the court cannot conclude that the state court made an unreasonable determination with respect to whether trial counsel should have challenged the police interview. The record contains ample evidence to indicate that Mr. Lowder was not so intoxicated as that "he [was] unconscious as to what he [was] saying that his confession" as required under Indiana law. As noted by the state appellate court, Mr.

Lowder's conscious adjustments to his narratives demonstrated his ability to consider Detective Duley's remarks and to recall his previous statements during the interview. Further, at trial, Mr. Lowder confirmed his recollection of the police interview by acknowledging that he made certain false statements during the interview and by conceding that he made such false statements for the purpose of avoiding responsibility for his actions -- in other words, his testimony strongly implied that he knew what he said during the police interview and why he said it. Moreover, as the state court observed, the record contains no evidence as to how such an expert would have testified or how it would have affected Mr. Lowder's defense. Consequently, it was not unreasonable for the state court to conclude that, if trial counsel had filed a motion to suppress, it would have likely been futile.

Additionally, the court cannot conclude that the outcome of trial would have likely been different if the police interview had been suppressed. Though Mr. Lowder refers to the police interview as a confession, it is unclear that Mr. Lowder confessed to any crimes during the interview, including the crimes of his conviction. The police interview established Mr. Lowder's involvement with Angela Dodson's death, but his involvement was corroborated by numerous other sources, including the Applegates, Malone, hospital staff, and physical evidence obtained from his vehicle where the shooting occurred. The police interview established Mr. Lowder's pattern of altering his narrative, but the prosecution also established this pattern through the testimony of the Applegates, Angela Dodson's father, and hospital staff as well as his recorded telephone calls from the Marion

County Jail. Therefore, the claim that trial counsel should have moved to suppress the police interview is not a basis for habeas relief.

       F.     *Ineffective Assistance of Trial Counsel – Failure to Explain Misleading Statement.*

Mr. Lowder argues that he is entitled to habeas relief because trial counsel failed to explain a misleading statement that occurred during Mr. Lowder's police interview. Specifically, the police interview included the following comment suggesting that Mr. Lowder had a prior conviction for murder:

**Detective Duley:** Which bar do you go to?

**Mr. Lowder:** Well, we went to Ro Dogs, we went to Ro Dogs on Southeastern . . .

**Detective Duley:** Okay.

**Mr. Lowder:** . . . and then we went to the Sugar Shack . . .

**Detective Duley:** Okay.

**Mr. Lowder:** . . . and from the Sugar Shack we went to my house, hung out for a few. That's when Troy[7] started playing with my son a little bit, you know what I mean, because he'd known him since he was a kid.

**Detective Duley:** Mmhmm.

**Mr. Lowder:** And that's when the other guy walked outside[8] . . . Well, actually my sister came and got Curtis.[9] The other guy walked outside and seen his stuff been broken into. Called Curtis because he might got a little mad since Troy might have got a little rough with him, you know what I

---

[7] Based on the court's reading, Mr. Lowder is referring to Troy Malone.

[8] According to the record, a fourth individual, Matt Scheckel was with Mr. Lowder, Angela Dodson, and Troy Malone when they were out at the bars, but, as detailed in this excerpt, this individual left the group prior to their arrival at the Applegate residence and the shooting of Angela Dodson. Based on the court's reading, Mr. Lowder is referring to Matt Scheckel.

[9] Based on the court's reading, Mr. Lowder is referring to his son.

mean? Called my sister, and she was like, no he come straight out the back door and didn't have nothing but his clothes that he brought with him you know what I mean? Well, old boy in the truck[10] took off you know what I mean? He was mad because his stuff was gone out the back of his truck. And that's when they was talking about more alcohol 'cause that's the truth went over there. Like I said, when I'm at Dave's[11] somehow conversation is on the phone you know what I'm saying, hear what's going on, I come outside side of the truck you know what I'm saying? And I hear her[12] saying keep watching for him, you know what I'm saying? So I fucking slide down the side of the black truck you know what I mean, and I'm going to bust them in the act you know what I'm saying? He's supposed to be one of my good buddies. I opened the door, and I'm like what the fuck man? What the fuck? And Angie she just you know what I mean didn't say nothing. He was like well I don't know what we going to do now. When he went like that, I went like that, you know what I mean, and shoved it away because it was unexpected you know what I'm saying and the gun went off, and I was like aw, man and he jumps out of the truck and he was like well, what do we do? What do we do now? What do we do now? I was like man, I don't . . . He was like well, I don't know nothing, and I ain't seen nothing you know what I mean? *And you know I've done know I did ten years for murder* and I'm thinking man are you going to shoot me next or what? So I jumped in the truck and took off.

ECF 9-8 at 53-54 (italics added for emphasis).

At trial, trial counsel raised her concern regarding the misleading nature of the comment, noting that it was intended to be a quote attributed to Troy Malone. ECF 9-4 at 50-66. She suggested that they clarify this comment through the testimony of Detective Duley, and the trial court agreed. *Id.* The parties clarified the comment as follows:

**Prosecution:** Alright, Detective, I'm going to jump back to the interview that you had with the defendant. In that interview, we read reference to the defendant saying that [Malone] had done time for a murder conviction, right?

---

[10] Based on the court's reading, Mr. Lowder is referring to Matt Scheckel.

[11] Based on the court's reading, Mr. Lowder is referring to the Applegate residence.

[12] Based on the court's reading, Mr. Lowder is referring to Angela Dodson.

**Detective Duley:** Correct.

**Prosecution:** And, in fact, during your investigation, did you learn that [Malone] had been convicted of voluntary manslaughter?

**Detective Duley:** Correct.

**Prosecution:** And was that for hitting another person with a board and that person dying?

**Detective Duley:** I believe so, yes.

* * *

**Trial Counsel:** Alright, Detective Duley, so during the course of your investigation, you did learn that Troy Malone had a conviction for voluntary manslaughter?

**Detective Duley:** Correct, I did.

*Id.* at 68-72.

At the post-conviction stage, the Indiana Court of Appeals rejected this claim, noting the trial counsel's efforts to clarify the misleading statement and concluding that Mr. Lowder had not shown prejudice. ECF 8-10 at 20-23. After reviewing the record, the court cannot find that the state court made an unreasonable determination on this claim. The prosecution's questioning drew the jury's attention to the misleading comment and unequivocally attributed the murder conviction to Mr. Malone. Detective Duley responded that Mr. Malone had been convicted of voluntary manslaughter and did not contest the underlying premise of the questioning. Detective Duley reiterated that Mr. Malone had been convicted of voluntary manslaughter during questioning by trial counsel. Mr. Lowder does not acknowledge the parties' efforts to explain the misleading statement or offer any explanation as to why these efforts were inadequate. Therefore,

the claim that trial counsel should have explained a misleading statement during Mr. Lowder's police interview is not a basis for habeas relief.

       G.     *Ineffective Assistance of Trial Counsel – Jail Calls.*

Mr. Lowder argues that trial counsel erred by allowing the prosecution to introduce portions of the jail calls at trial and that trial counsel should have introduced the jail calls in their entirety. Under Indiana law, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with it." Ind. R. Evid. 106. "This rule may be used to admit omitted portions of a statement in order to (1) explain the admitted portion; (2) place the admitted portion in context; (3) avoid misleading the trier of fact; or (4) insure a fair trial and impartial understanding of the admitted portion." *Hawkins v. State*, 884 N.E.2d 939, 947 (Ind. Ct. App. 2008). "The trial court is not required to admit the remainder of the statement, or portions of that statement, if they are neither explanatory of nor relevant to the parts already introduced." *Id.*

At the post-conviction stage, trial counsel testified that the recordings were redacted by stipulation and that she did not find the portions of the jail calls that were introduced at trial to be misleading or confusing. ECF 9-14 at 6-51. She testified that most of the recorded conversations were unfavorable to Mr. Lowder and that none of them would have assisted with his defense. *Id.* At the post-conviction stage, the Indiana Court of Appeals found that Mr. Lowder had not demonstrated prejudice with respect to the trial counsel's failure to invoke the rule of completeness because he did not assert that

the jailhouse calls included any exculpatory information and because he did not describe how the omitted portions of the telephone calls would have assisted his defense. ECF 8-10 at 23-25.

After reviewing the record, the court cannot determine that the state court made an unreasonable determination with respect to this claim. Mr. Lowder does not explain how the admitted portions of the telephone calls were misleading or confusing, particularly when trial counsel gave him the opportunity to explain them during his testimony. He also does not describe the contents of the omitted portions or provide specific examples of how introducing the omitted portions would have affected the outcome of the case. Consequently, Mr. Lowder has not adequately demonstrated that the decision to not invoke the rule of completeness amounted to deficient performance or that it prejudiced his case, so this claim is not a basis for habeas relief.

      H.    *Ineffective Assistance of Trial Counsel – Defense Strategy.*

Mr. Lowder argues that trial counsel provided ineffective assistance by adhering to an inadequate defense strategy, consisting of conceding Mr. Lowder's guilt to battery and reckless homicide and by failing to argue self-defense.

At trial, Mr. Lowder testified to facts suggesting that he committed reckless homicide and battery, denied intent to kill Angela Dodson, and said that the jury should find him guilty of battery. ECF 9-4 at 80-103. During closing argument,[13] trial counsel

---

[13] Trial counsel's closing argument suggests trial counsel also deployed this strategy during opening statements, but opening statements were not included in the state court record for this court's review.

conceded Mr. Lowder's guilt as to the battery of Troy Malone and the reckless homicide of Angela Dodson. *Id.* at 156-64. She argued that, while Mr. Lowder was dishonest on other occasions, he testified truthfully at trial and that the evidence pointed to reckless homicide rather than an intentional killing. *Id.*

At the post-conviction stage, trial counsel testified that her defense strategy was to concede the lesser offenses to avoid convictions on the more serious offenses. ECF 9-14 at 6-51. She did not recall that self-defense was an option given her understanding of the facts of the case. *Id.* According to trial counsel, she had discussed the defense strategy with Mr. Lowder, and he agreed with it. *Id.* Also at the post-conviction stage, Mr. Lowder testified that Troy Malone had come at him aggressively when Mr. Lowder opened the vehicle door and that he struck him with the pistol to defend himself, which discharged at Angela Dodson. *Id.* at 73-85. He also submitted an affidavit from Mr. Malone to that effect, and Mr. Malone acknowledged the attestations as his own on the witness stand. *Id.* at 53-61; ECF 9-16 at 53-56. Mr. Lowder testified that, though he conveyed these facts to trial counsel, she never discussed self-defense with him. ECF 9-14 at 73-85.

The Marion Superior Court credited trial counsel's testimony regarding her discussion with Mr. Lowder before trial and her understanding of Mr. Lowder's perspective on what had happened on the night of the shooting. ECF 9-12 at 158-83. The Indiana Court of Appeals rejected the claim that trial counsel should have argued self-defense, finding that the trial record contained no evidence to support it. ECF 8-10 at 25-28. The appellate court further found it unlikely that Mr. Lowder would have prevailed on a theory of self-defense even if the post-conviction testimony had been presented at

trial and even if the jury believed it. *Id.* The appellate court reasoned that Mr. Malone was intoxicated and failed to land a punch on Mr. Lowder when Mr. Lowder struck him with the pistol. *Id.* It also noted that the Applegates' testimony suggested that Mr. Lowder was the initial aggressor. *Id.* The appellate court concluded that Mr. Lowder had not demonstrated deficient performance or prejudice. *Id.* The appellate court similarly concluded that, based on trial counsel's testimony, trial counsel's concession of guilt as to battery and lesser homicide were strategic decisions subject to deference and did not constitute deficient performance. *Id.*

After reviewing the record, the court cannot find that the state court made an unreasonable determination on this claim. To start, the court observes that Mr. Lowder's testimony at the post-conviction review that he struck Troy Malone to defend himself directly contradicts his testimony at trial that he struck Mr. Malone out of anger with no suggestion that he reasonably believed that Mr. Malone would cause him bodily harm.[14] At the post-conviction stage, Mr. Lowder testified that he told trial counsel that he struck Troy Malone with the pistol in self-defense, but trial counsel testified that she discussed the defense strategy with Mr. Lowder and did not consider self-defense as an option based on her understanding of the events from Mr. Lowder's perspective—an understanding that was likely consistent with Mr. Lowder's trial testimony. The state court credited trial counsel's testimony on these points, and the court must defer to this

---

[14] Mr. Lowder offers no explanation for why he would have offered false testimony at trial or why he would have admitted to committing crimes that he did not commit.

credibility determination because Mr. Lowder has not presented clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

Further, no evidence suggesting self-defense was presented at trial; rather, the trial evidence unequivocally indicated that Mr. Lowder had battered Mr. Malone and that he had caused the death of Angela Dodson by shooting her. By contrast, the issue of Mr. Lowder's state of mind at the time of the shooting presented a far more debatable point, though it remained hampered by the numerous and false versions of Mr. Lowder's narrative that suggested a lack of credibility and consciousness of guilt. Given trial counsel's understanding of the facts and given the evidence presented at trial, it was not an unreasonable strategy concede the lesser offenses in an effort to bolster Mr. Lowder's credibility and to avoid convictions on the charges of voluntary manslaughter and murder rather than pursuing a theory of self-defense.

Additionally, it is unclear that pursuing the self-defense strategy as proposed by Mr. Lowder would have been likely to change the outcome of the case. The jury's verdict on the murder charge illustrates that the jury did not credit Mr. Lowder's testimony that he did not intentionally kill Angela Dodson, and Mr. Lowder offers no explanation for why the jury would have treated testimony on self-defense more favorably. Therefore, this claim is not a basis for habeas relief.

I.    *Ineffective Assistance of Trial Counsel – Cumulative Effect.*

Finally, Mr. Lowder argues that, even if no individual error by trial counsel was sufficiently prejudicial to merit habeas corpus relief, the court should grant him relief based on the cumulative prejudice of all of the errors by trial counsel combined.

"[P]rejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008).

At the post-conviction stage, the Indiana Court of Appeals summarily rejected the claim regarding cumulative error, incorporating its analyses of the individual claims. ECF 8-10 at 29. The court cannot find that this determination was unreasonable. Most of Mr. Lowder's claims fall well short of satisfying *Strickland* or any deficient performance by trial counsel, but all, even in the aggregate, fail to establish prejudice.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Mr. Lowder to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED.

December 15, 2021                          *s/ Damon R. Leichty*
                                           Judge, United States District Court